## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**BRENDA M. HORTON,**                         Case No. 5:19 CV 321

      Plaintiff,                                   Judge James Gwin

      v.                                          Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                 **REPORT AND RECOMMENDATION**

### INTRODUCTION

Plaintiff Brenda M. Horton ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated February 12, 2019). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be reversed and remanded for further proceedings.

### PROCEDURAL BACKGROUND

Plaintiff filed for SSI in September 2016, and DIB in November 2016, alleging a disability onset date of July 15, 2016. (Tr. 248-49, 255-56). Her claims were denied initially and upon reconsideration. (Tr. 154-56, 161-64, 172-74, 179-80). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 184-85). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on May 29, 2018. (Tr. 32-86). On

July 11, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 15-23). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on February 12, 2019. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Born in 1975, Plaintiff was almost 41 years old on her alleged onset date, and almost 43 years old on the date of the ALJ decision. *See* Tr. 248, 255. Plaintiff had a high school education (Tr. 40), and past work as an office clerk and retail cashier, *see* Tr. 21, 78.

Plaintiff was diagnosed with diabetes at the age of six. (Tr. 48). She did not have problems controlling it until 2015, and then suffered a heart attack in 2016; Plaintiff was diagnosed with uncontrolled diabetes and given an insulin pump two months prior to the hearing, though she had difficulty with it not working properly. *See* Tr. 48-50; *see also* Tr. 49 ("Yesterday, my sugar wouldn't come down below 400. Today, I couldn't get it over 70."); *see also* Tr. 52 (describing difficulty with pump). Plaintiff checked her blood sugar about seven times per day, sometimes more frequently. (Tr. 52-53).

Plaintiff described symptoms including vision problems, perspiration, irritability, nausea, frequent urination, constant thirst, arm numbness, hip pain., as well as back, neck, and shoulder problems. *See* Tr. 47-48, 50, 53-54. Her vision problems, when they occurred, lasted up to ninety minutes. (Tr. 51). She had neuropathy in her arms and hands and diabetic nerve pain in her feet. (Tr. 57). She wore special shoes which helped somewhat with the pain in her feet, but they hurt with prolonged standing. (Tr. 57-58). Plaintiff also had shots in her wrists which relieved her fingertip numbness, and some pain. (Tr. 58-59). She received chiropractic care, injections, and

orthopedic treatment for her back, neck, and shoulder problems. (Tr. 53-54). She also had frequent kidney infections. (Tr. 55). Plaintiff further had heart problems, but they were under control. (Tr. 56-57). To treat her diabetes, Plaintiff tried to exercise and maintain a healthy diet; she also elevated her feet and used a neck pillow. (Tr. 61-62).

Plaintiff testified her main problem was weakness and dizziness. (Tr. 47). Medication she took twice per day caused dizziness for about an hour. *Id.* She also had problems with arm numbness, hip pain, and vision disturbances. (Tr. 47-48).

At the time of the hearing, Plaintiff worked sixteen to eighteen hours per week at 7-Eleven. (Tr. 38). She previously worked the same job for at least eight hours per day; since 2016, and at the time of the hearing, she worked "three to four" hours per day depending on how she felt. *Id.* Plaintiff described job duties such as placing orders on a computer, filing paperwork, waiting on customers, training new hires, and cooking. (Tr. 45-46). Previously, she could stock items, reset shelves, empty garbage cans, and mop the floor. (Tr. 46). She could no longer perform these tasks due to back pain, leg numbness, arm numbness, and difficulty standing and bending. (Tr. 46-47). Sometimes Plaintiff took breaks at work to check her blood sugar; this required other employees to cover for her. (Tr. 53). Plaintiff frequently had to adjust her work schedule due to her condition. (Tr. 72, 76).

Plaintiff testified she was able to drive, and that she could comfortably drive for about 45 minutes before her hips and arms go numb; she stopped to stretch her legs and walk. (Tr. 39-40). Plaintiff had diabetic symptoms while driving occasionally. (Tr. 69). Weekly, she postponed or cancelled a trip somewhere because her symptoms made it feel unsafe to drive. (Tr. 70-71).

Plaintiff grocery shopped, usually with her daughter, but could not lift heavy items. (Tr. 67). When shopping by herself, she used an electric cart due to back pain, leg neuropathy, and

vision sensitivity to light in the stores. *Id.* Plaintiff was involved with the Girl Scouts as an outdoor training facilitator. (Tr. 68). At home, Plaintiff swept the floor, washed dishes, loaded the dishwasher, and wiped counters. *Id.* Her daughter cleaned the bathroom, vacuumed, and made beds. (Tr. 67-68).

Plaintiff exercised at a cardiac rehabilitation center about three times per week; she used a treadmill, a machine called a "New Step" which used arms and legs at the same time, a rowing machine, and an arm bike for her shoulder. (Tr. 60-61).

On the day prior to the hearing, Plaintiff got up, checked her blood sugar, got dressed for work, and let her dogs out. (Tr. 63). At work, she stocked cigarettes, made coffee, placed some orders on the computer, and waited on a few customers. *Id.* She returned home at lunch time, checked her blood sugar, let her dogs out, did a load of laundry, and checked her blood sugar again. (Tr. 64). Around dinnertime, her blood sugar dropped, so her daughter brought dinner over because she felt it was dangerous to use the stove with low blood sugar affecting her vision. *Id.*

When Plaintiff's blood sugar got very low (about ten times per week), it took about three hours to regulate again. (Tr. 74).

Relevant Medical Evidence

As Plaintiff testified, she had diabetes since age six. *See* Tr. 48. In July 2016, Plaintiff saw nurse practitioner Frank Gargasz with the Summa Physicians, Inc. endocrinology department. (Tr. 924-30). She complained of fatigue and reported variable blood glucose results between 50 and 400; her medical compliance was noted to be good. (Tr. 924). Plaintiff also reported arm numbness and hair loss. (Tr. 927). On examination, Mr. Gargasz noted Plaintiff was obese, and had 2+ pulses in her feet. *Id.* He assessed Type 1 diabetes with complication, noting her diabetes "show[ed]

4

variable control." (Tr. 929). He noted Plaintiff had a hypoglycemic event during her office visit, with her blood glucose "in the 40s." *Id.*; *see also* Tr. 928 (lab test showing blood glucose of 44).

Six days later, Plaintiff went to the emergency room reporting chest pain, tightness, heaviness, and some radiation to her back; she also had vomiting. (Tr. 454). Plaintiff was ultimately admitted to the hospital with diagnoses of diabetic ketoacidosis, chest pain, nausea, and vomiting. (Tr. 462). One physician noted Plaintiff had uncontrolled diabetes with hyperglycemia (Tr. 480), and another noted "a suspicion of poor compliance with insulin regimen" (Tr. 482). Hospital physicians ultimately discovered Plaintiff had a heart attack and she underwent a left cardiac catheterization, coronary angiography, stent placement, and angioplasty. (Tr. 486-501). She was discharged two days later. *See* Tr. 502-04.

In August 2016, Plaintiff saw family practice physician Rachel Hummell, M.D. for follow up. (Tr. 882-87). Plaintiff reported no chest pain, but occasional palpitations. (Tr. 882). She reported her sugars were back to "normal" with "better control, improved diet and exercise." *Id.* She was also noted to have diabetic retinopathy with a follow up appointment scheduled. *Id.* She was returning to work that day. *Id.* Plaintiff's review of systems was negative (Tr. 882-83), and Dr. Hummell noted she should follow up with her endocrinologist (Tr. 886).

That same month, Plaintiff saw a physician at the Akron General Heart and Vascular Center, where she reported walking for exercise. (Tr. 1228). At a subsequent cardiac follow-up appointment, Plaintiff reported no chest pain, lightheadedness or dizziness; she had some shortness of breath and palpitations. (Tr. 1082). She reported no musculoskeletal issues. (Tr. 1085).

In September 2016, Plaintiff returned to Mr. Gargasz. (Tr. 917-22). He noted Plaintiff checked her blood sugar five to seven times per day, and that "[o]verall blood glucose control are variable" with readings "50's-400's[,] higher at bedtime." (Tr. 917). Plaintiff reported fatigue,

visual disturbance, hair loss, and arm numbness. (Tr. 920). On examination, Mr. Gargasz noted 2+ pulses in Plaintiff's feet, and no neurological or musculoskeletal problems. *Id.* He assessed, *inter alia*, uncontrolled Type 1 diabetes, and instructed Plaintiff to adjust her carb ratio and keep a blood sugar log. (Tr. 922).

Also in September, Plaintiff saw Joseph Coney, M.D., at Retina Associates of Cleveland. (Tr. 818-19). She reported blurred vision, and Dr. Coney assessed improving proliferative diabetic retinopathy and peripheral retinal ischemia; he recommended and performed injections. *Id.*

In October, Plaintiff reported ongoing heart palpitations and difficulty breathing. (Tr. 842, 845). She was diagnosed with, *inter alia*, stable mild persistent asthma, and pulmonary emphysema. (Tr. 846).

Plaintiff again saw Mr. Gargasz in December 2016, reporting fatigue, blurred vision, hair loss, and arm numbness. (Tr. 901, 904). She again reported checking her blood sugar five to seven times per day, and her "[o]verall blood glucose control are variable" with readings "50's-300's[,] higher at bedtime." (Tr. 901). Her compliance was good. *Id.*[1] Her physical examination was unremarkable, other than notations of obesity and 2+ foot pulses. (Tr. 904-05). Mr. Gargasz noted Plaintiff's diabetes "show[ed] variable control." (Tr. 906). He instructed Plaintiff to "[d]ecrease NPH to 14 units at night" and "take 14 units in the morning when more active." *Id.*

---

1. The Commissioner states that "Nurse Gargasz noted Plaintiff was not being compliant with her insulin use." (Doc. 14, at 5) (citing Tr. 902). As best as the undersigned can discern, the Commissioner appears to be referring to a list of outpatient prescriptions on this page which includes an insulin pen needle, and states: "1 each by Does not apply route 3 times daily." (Tr. 902). The undersigned finds this record less clear in showing Plaintiff was "not being compliant", especially given his statement within the same record that her "[c]ompliance with medical regimen has been good." (Tr. 901).

Plaintiff also returned to Dr. Coney in December 2016. (Tr. 888-90). She reported worsening moderate blurred vision. (Tr. 888). He again assessed improving proliferative diabetic retinopathy, and peripheral retinal ischemia; he recommended observation. (Tr. 889).

At her next appointment with Mr. Gargasz in March 2017, he noted Plaintiff did not "decrease [her] basal dose at night to 14 but she has continued 17 units of NPH". (Tr. 1327). He again noted, however, that her "[c]ompliance with medical regimen has been good." *Id.* Her blood glucose levels were "variable", with readings in the 120s while fasting, 200 before lunch or dinner, and 100-150 at bedtime; she had hypoglycemia once every two weeks. *Id.* Plaintiff's review of systems was negative except for reports of nausea, hair loss, and arm numbness; she denied visual disturbance. (Tr. 1329). Plaintiff's physical examination revealed the same notations of obesity and 2+ foot pulses. (Tr. 1329-30). Mr. Gargasz adjusted Plaintiff's medications. (Tr. 1331-32).

Plaintiff again saw Mr. Gargasz in May 2017; this time she reported being sick for two weeks, and that she had polyuria, polydipsia, polyphagia, fatigue, and arm numbness. (Tr. 1313, 1315). She denied visual disturbance. (Tr. 1315). Her blood glucose control was again noted to be "variable" with numbers from "30's-400's". (Tr. 1313). Mr. Gargasz noted Plaintiff's "[c]ompliance with medical regimen has been good." *Id.* Plaintiff's pulmonary examination was "coarse bilaterally"; Mr. Gargasz continued his physical findings of obesity and 2+ foot pulses, but the physical examination was otherwise normal. (Tr. 1315-16). Mr. Gargasz instructed Plaintiff to adjust her insulin, adjust her carb ratio, and "[d]ecrease NPH at bedtime to 12 units." (Tr. 1317).

Plaintiff returned to Dr. Coney in June reporting mild blurred vision. (Tr. 1244). He provided the same assessments (improving proliferative diabetic retinopathy and peripheral retinal ischemia); he recommended and performed injections. (Tr. 1245-46).

7

In September, Plaintiff saw Mr. Gargasz, reporting fatigue, nausea, polydipsia, polyphagia, polyuria, arm numbness, and hair loss; she denied visual disturbance. (Tr. 1305). Mr. Gargasz again noted Plaintiff's medical regimen compliance was "good". (Tr. 1303). Mr. Gargasz made the same physical findings as he did in May. (Tr. 1305-06). He noted Plaintiff' diabetes was "much improved from previous", and that she had "[n]o recent hypoglycemia." (Tr. 1308). He noted Plaintiff's complaint of upper extremity numbness and referred her to neurology. *Id.*

In November, following a hospitalization for anemia (*see* Tr. 1814-89), Plaintiff returned to Mr. Gargasz reporting her blood glucose levels were higher in the hospital because she was not given appropriate insulin. (Tr. 1971). She reported elevated blood glucose levels, with readings of 180-200 fasting, 300-350 before lunch, 400 before dinner, and 300 at bedtime; she had no recent hypoglycemia. *Id.* Her compliance was again noted to be "good". *Id.* Plaintiff reported similar symptoms to her previous visits, and Mr. Gargasz made similar findings on examination (normal except for obesity and 2+ foot pulses). (Tr. 1974-75). Mr. Gargasz noted Plaintiff's diabetes was "not well controlled since being discharged from t[the] hospital." (Tr. 1976). He "[c]ounseled [Plaintiff] on the effects of uncontrolled diabetes on other organ systems." *Id.*

In December 2017, Plaintiff saw Jonathan Streit, M.D., for right shoulder stiffness and pain. (Tr. 1625-35). She reported being unable to lift one pound to her shoulder without bending her elbow, or lift eight pounds to the top of her head. (Tr. 1635). On examination, Plaintiff had reduced range of motion in her cervical spine, but no paresthesias or radicular symptoms; she had full strength and sensation in her hand, but significant rotational pain with the arm abducted, and pain with a forward flexion test. (Tr. 1631). Dr. Streit noted imaging revealed "severe glenohumeral joint osteoarthritis with loss of joint space, sclerosis, and osteophyte formation"; he assessed osteoarthritis. *Id.* Dr. Streit recommended surgery, but noted that "based on her

complicated medical history, we discussed needing more information about her prognosis in regards to her chronic kidney disease." *Id.* He concluded that Plaintiff could "continue to use the shoulder without restriction at this time." (Tr. 1630).

Also in December 2017, Plaintiff underwent a motor and sensory nerve study with Bina Mehta, M.D. (Tr. 1588-89). Dr. Mehta noted the testing "was significant for a bilateral sensorimotor median neuropathy, at or distal to the wrist, moderate in nature with a conduction block present, consistent with carpal tunnel syndrome." (Tr. 1589). He also noted there was "no definite evidence of neuropathy related to her type 1 diabetes." *Id.*

Plaintiff also returned to Dr. Coney in December 2017, reporting worsening moderate blurred vision. (Tr. 1373). Dr. Coney assessed stable proliferative diabetic retinopathy and recommended observation. (Tr. 1374).

In February 2018, Plaintiff returned to Mr. Gargasz, reporting she had a "carpal tunnel shot 2 weeks" prior. (Tr. 1966). She had upper extremity numbness. *Id.* Mr. Gargasz noted Plaintiff's diabetes was "not well controlled" and she had hypoglycemia episodes. *Id.* He advised that an insulin pump would "help variability" and "be beneficial". *Id.* Her blood glucose level at this appointment was 291. (Tr. 1962). At a chiropractic appointment that same month for neck pain, Plaintiff denied tingling or weakness. (Tr. 1451).

Plaintiff saw neurologist Joshua Gordon, M.D., in early March 2018 for an evaluation of possible neuropathy. (Tr. 1637). She reported hand numbness and "disturbance of sensation in the feet". *Id.* She reported having these symptoms for years, and that she could "shake her hands out to alleviate the symptoms." *Id.* She also noted her diagnosis of carpal tunnel syndrome but that it responded to injections. *Id.* Dr. Gordon noted Plaintiff had a normal neurological examination, with a positive Tinel's sign at the left wrist; her sensation was intact. (Tr. 1641). He noted that

9

"[w]hile some of her symptoms are very compatible, reviewed that some of the proximal upper extremity numbness she was having is atypical for carpal tunnel syndrome. Fortunately this is resolved." *Id.* He also noted there were "[n]o clear objective signs of neuropathy" in Plaintiff's feet "aside from absent reflexes." *Id.*

At chiropractic examinations in February and March, Plaintiff denied tingling or weakness. (Tr. 1384, 1392, 1400, 1412, 1420, 1429, 1437).

Plaintiff again saw Mr. Gargasz in March 2018, continuing to report numbness in her arms. (Tr. 1962). Her physical examination was again unremarkable but for obesity and 2+ foot pulses. *Id.* Mr. Gargasz again noted Plaintiff's diabetes was not well controlled, and discussed an insulin pump. (Tr. 1963).

*Medical Opinion Evidence*

In December 2016, Mr. Gargasz completed a medical source statement. (Tr. 899-900). Therein, he listed Plaintiff's diabetes diagnosis, and noted she suffered from numerous symptoms including difficulty walking, fatigue, episodic vision blurriness, infections, excessive thirst, rapid heart rate, muscle weakness, retinopathy, vascular disease, insulin shock, nausea, extremity pain and numbness, difficulty thinking, dizziness/loss of balance, and hyper/hypoglycemic attacks. (Tr. 899). He noted Plaintiff needed to test her blood glucose levels four to six times per day, and treat low blood glucose when needed. *Id.* He opined Plaintiff could lift or carry ten pounds. *Id.* He opined Plaintiff's ability to stand and walk was affected, but did not answer a question regarding how many hours Plaintiff could stand or walk in an eight-hour workday. *Id.* He opined Plaintiff could sit for four hours in an eight-hour workday, two without interruption, and she needed a job that permitting shifting positions at will. *Id.* Mr. Gargasz also opined Plaintiff could use both hands for gross and fine manipulations; she had no limitations in her ability to reach with her left arm,

but could only use her right arm to reach forward twenty percent of a workday, and reach overhead five percent of a workday. (Tr. 900). Mr. Gargasz opined Plaintiff should avoid concentrated exposure to extreme temperatures, wetness, and humidity, and avoid all exposure to cigarette smoke. *Id.* He opined Plaintiff would: be off-task twenty percent of a workday, miss about three days of work per month, and need four unscheduled breaks during a workday. (Tr. 899-900).

In November 2016, State agency physician Abraham Mikalov, M.D., reviewed Plaintiff's records. (Tr. 108-09). He opined Plaintiff could occasionally lift twenty pounds, and frequently lift ten. (Tr. 108). She could stand or walk about six hours in an eight-hour workday, and sit about six hours. *Id.* He also opined she could occasionally climb ramps or stairs, stoop, kneel, or crawl; she could frequently balance and never climb ramps or stairs. (Tr. 108). He also noted she should avoid concentrated exposure to extreme temperatures, pulmonary irritants, and hazards. (Tr. 109).

The following month, State agency physician James Cacchillo, D.O., reviewed Plaintiff's records, and offered the same limitations as Dr. Mikalov. (Tr. 134-36).

*Other Opinion Evidence*

In March 2018, Joe White, Manager at the 7-Eleven where Plaintiff worked, wrote a letter stating Plaintiff was one of his "best employees." (Tr. 380). He noted "a strain in her work performance" due to a need to take frequent restroom breaks, breaks to check her blood sugar levels, and time to correct her blood sugar levels." *Id.* He explained that she was unable to work more than a few hours per day doing light job assignments, and it was often difficult for her to even complete those tasks. *Id.* He noted her past job performance "was that of two people" and was now "half of one". *Id.* She helped in the office "as long as she can . . . but has to stop often and rarely finishes all of the assignments." *Id.*

11

Assistant Manager Sylvia Solomon also wrote a letter stating that Plaintiff's "performance has been somewhat lacking" since July 2016 "due to her current health status" and that she required frequent breaks. (Tr. 381). She noted that "[t]hough [Plaintiff] tries, she needs help doing her daily job duties." *Id.* She also noted that 7-Eleven "made some accommodations for her due to her inability to finish a full shift or complete a task in its whole by assigning a secondary person. It is not safe or profitable to our company to leave [Plaintiff] [to] work by herself in case there is a medical issue." *Id.*

VE Testimony

A VE testified at the hearing before the ALJ. (Tr. 77-82). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. (Tr. 79-80). The VE responded that such an individual could not perform Plaintiff's past work, but could perform jobs such as sedentary polisher, call-out operator, and order clerk. (Tr. 80-81). The VE testified that adding a break every two hours would not change his answers, as "that's really the norm." (Tr. 81). The VE also testified that being off task up to ten percent of the day is acceptable, but twenty percent is not. (Tr. 81-82). Similarly, missing work two or more days per month would preclude work. (Tr. 82).

ALJ Decision

In his July 2018 written decision, the ALJ found Plaintiff met the insured status requirements for DIB through December 31, 2022 and had not engaged in substantial gainful activity since her July 15, 2016 alleged onset date. (Tr. 17).[2] She had severe impairments of Type

_____

2. The ALJ further explained that, although Plaintiff worked and had income, "the claimant's employer accommodates her at work and therefore I do not consider her earnings from the job when determining substantial gainful activity[.]" (Tr. 17).

1 diabetes, diabetic neuropathy, ischemic heart disease, and cervical degenerative disc disease, but none of these impairments – singly or in combination – met or equaled the severity of a listed impairment. (Tr. 17-18). The ALJ set forth Plaintiff's RFC as follows:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: limited to frequently reaching overhead to the left and frequently reaching overhead to the right; for all other reaching she can reach frequently to the left and can reach frequently to the right; limited to frequent handling bilaterally; limited to frequent fingering bilaterally; limited to frequent feeling bilaterally; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; avoid concentrated exposure to unprotected heights, moving mechanical parts, and operating a motor vehicle; avoid concentrated exposure to dusts, fumes, odors[,] gases, extreme cold, and extreme heat.

(Tr. 18-19). Given her age, education, work experience, and RFC, the ALJ found Plaintiff could not perform her past relevant work, but could perform other jobs existing in significant numbers in the national economy such as polisher, call-out operator, or food and beverage order clerk. (Tr. 21-22). Therefore, the ALJ found Plaintiff not disabled. (Tr. 22).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or

indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

14

Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff contends the ALJ's reasons for discounting the opinion of her treating provider – Mr. Gargasz – are unsupported. Specifically, she contends the ALJ: 1) incorrectly relied on "improvement" in Plaintiff's condition without citation to supporting records; 2) improperly relied on her part-time work activity and daily activities to discount that opinion and her limitations; and 3) inadequately assessed Plaintiff's credibility. For the reasons discussed below, the undersigned recommends the decision be reversed and remanded for further proceedings.

Evaluation of Mr. Gargasz's Opinion

Plaintiff contends the ALJ violated the rules for evaluating opinion evidence in his consideration of the opinion from "Dr. Gargasz." Preliminarily, however, as noted above, Mr. Gargasz is a nurse practitioner. *See, e.g.*, Tr. 924.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188.[3] A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). When the physician's medical opinion is not granted

---

3. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed her claim in 2016 and thus the previous regulations apply.

controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. An "acceptable medical source" includes "licensed physicians" and "licensed or certified psychologists." 20 C.F.R. § 404.1513(a)(1)–(2). Evidence from those who are "not acceptable medical sources" or "other sources", is "important and should be evaluated with key issues such as impairment severity and functional effects, along with other relevant evidence in the file." SSR 06-3p, 2006 WL 2329939, at *2. This is because "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." *Id.* The ALJ "generally

16

should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at \*6.

Interpreting SSR 06-3p, the Sixth Circuit explained that "[o]pinions from non-medical sources who have seen the [Plaintiff] in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion in with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). A nurse practitioner is such an "other source". *Id.*

In his opinion, the ALJ summarized Mr. Gargasz's opinion, and explained his reasons for assigning it "some" weight:

> [I]n December 2016, Dr. Frank Gargasz, NP, one of the claimant's treating endocrinologists[,] concluded that the claimant has work-related limitations from her diabetes mellitus. Dr. Gargasz concluded that the claimant can sit for 4 hours total, 2 hours at a time, in an 8-hour workday. She can lift/carry 10 pounds. She may need to take 4 or more unscheduled breaks per day. She has limited use of her right arm for reaching in front and overhead. She must avoid concentrated exposure to extreme cold, extreme heat, high humidity, and wetness. She must avoid all exposure to cigarette smoke. She would be off-task 20% of the workday (13F). I afford some weight to Dr. Gar[]gasz's opinion insofar as the record supports limitations in the claimant's ability to reach/work overhead. However, the remainder of the opinion is not consistent with the overall record, which shows that the claimant's disorders improved as well as her daily activity level and current work activity. The claimant would not need time off task outside of usual breaks; she could check her blood-glucose during regular meal or break periods. Lastly, the claimant does not have considerable issues with fatigue, dizziness or shortness of breath warranting the need for unscheduled breaks.

(Tr. 20).

Although the first reason the ALJ provided for discounting Mr. Gargasz's opinion is that Plaintiff's "disorders improved"; he provided no citation for this statement. *Id.* Mr. Gargasz's opinion was based on Plaintiff's diabetes. *See* Tr. 899. Two paragraphs prior, the ALJ noted that

17

Plaintiff's "follow-up examination with her endocrinologist showed continued stability in her diabetes condition." (Tr. 20). For this proposition, the ALJ cited Exhibit 29F, a 49-page exhibit consisting of Plaintiff's treatment notes with Mr. Gargasz from March to September 2017. (Tr. 1302-59). Therein, at a September 2017 visit, Mr. Gargasz noted Plaintiff's diabetes was "much improved from previous", but also noted Plaintiff would benefit from an insulin pump to "help with variability" and "help prevent hypoglycemia." (Tr. 1308). Within the same cited exhibit, Mr. Gargasz noted in March and May 2017 that Plaintiff's blood glucose control was "variable". (Tr. 1313, 1327); *see also* Tr. 1317, 1331 ("Diabetes shows variable control."). In March, he explained: "Overall blood glucose control are variable. Fasting 120's, before lunch 200, before dinner 200's, bedtime 100-150[.]" (Tr. 1327). In May, he noted: "Overall blood glucose control are variable. 30's-400's. Higher at bedtime. Hypoglycemia occasional usually in middle of night." (Tr. 1313). Moreover, both earlier and later records similarly show a lack of stability. *See* Tr. 924 (July 2016 – variable blood glucose levels from 50 to 400); Tr. 917 (September 2016 – same); Tr. 901 (December 106 – variable blood glucose levels from 50 to 300); Tr. 1327 (March 2017 – variable blood glucose levels from 100 to 200); Tr. 1313 (May 2017 – variable blood glucose levels from 30 to 400); Tr. 1969 (February 2018 – diabetes "not well controlled"); Tr. 1962 (February 2018 – blood glucose measurement of 291); Tr. 1963 (March 2018 – diabetes "not well controlled"). The undersigned thus find there is not substantial evidence for the ALJ's statement that Plaintiff had "continued stability in her diabetes condition" and this therefore does not provide support for the ALJ's discounting Mr. Gargasz's opinion because Plaintiff's diabetes had "improved". (Tr. 20).

Further, the ALJ noted that "In March 2018, the claimant's treating nephrologist recommended an insulin pump for treatment of the claimant's diabetes and greater control of her blood sugar levels, as the doctor indicates issues with medical compliance." (Tr. 20). For this

proposition, the ALJ again cited an entire exhibit – Exhibit 40F. *Id.* Exhibit 40F contains 28 pages and contains Plaintiff's treatment with Mr. Gargasz from September 2017 through March 2018. (Tr. 1959-86).[4] The cited exhibit does contain the referenced March 2018 visit, at which time Mr. Gargasz described Plaintiff's diabetes as "not well controlled" and he adjusted her insulin dose. *See* Tr. 1960-64. He also noted at this visit that Plaintiff "would like insulin pump" and referred her for that purpose. (Tr. 1963). However, although the ALJ states that "the doctor indicates issues with medical compliance", nowhere does he point to which records support this statement. The Commissioner also cites evidence of this "noncompliance" in his brief. *See* Doc. 14, at 5 ("Nurse Gargasz noted Plaintiff was not being compliant with her insulin use. (Tr. 902)."); Doc. 14, at 6 ("Plaintiff returned to Nurse Gargasz again in March 2017, and he again noted she was not being compliant. (Tr. 1326-27)."); Doc. 14, at 11 ("Even her primary endocrinology care provider, Nurse Gargasz, found that her diabetes was much improved when she was complaint with his direction. (Tr. 20, citing Exh 29F (Tr. 1308))."). However, as set forth in the fact section above, Mr. Gargasz repeatedly noted Plaintiff's "[c]ompliance with medical regimen has been good." *See* Tr. 924 (July 2016), Tr. 901 (December 2016), Tr. 1327 (March 2017), Tr. 1313 (May 2017), Tr. 1303 (September 2017), Tr. 1971 (November 2017). He even included this notation in two of the three records the Commissioner now cites (Tr. 901, 1327) – and again, the ALJ failed to cite specifically – as evidence of noncompliance. The undersigned cannot, thus find the ALJ's statement that the insulin pump was prescribed due to Plaintiff's "noncompliance" with other treatment supported by substantial evidence. This further demonstrates the lack of substantial evidence to support the ALJ's reliance on "improvement" to discount Mr. Gargasz's opinion.

---

4. Transcript pages 1979-86 are a duplicate of Plaintiff's September 2017 visit. *See* Tr. 1302-10.

Next, the ALJ cited Plaintiff's "current work activity" as inconsistent with Mr. Gargasz's opinion. (Tr. 20). To repeat, Mr. Gargasz stated that Plaintiff could only sit for four hours total, two hours at a time, would require four or more unscheduled breaks per day, be off-task twenty percent of the day, and miss three days of work per month. (Tr. 899-900). The only evidence of Plaintiff's "current work activity" in the record is from Plaintiff's testimony (Tr. 45-48, 53, 70-71, 73-74, 76), and letters from her supervisors (Tr. 380-81). Plaintiff's work, as described in this evidence, appears to accommodate all of Mr. Gargasz's restrictions. That is, it is not apparent, nor did the ALJ explain, how this work activity is inconsistent with Mr. Gargasz's opinion.

Finally, the ALJ cited Plaintiff's "daily activity level" as inconsistent with Mr. Gargasz's opinion, again, without citing any specific activity or record. (Tr. 20). Searching the ALJ's opinion for reference to what these daily activities are, the undersigned finds reference to Plaintiff's ability to drive a car for up to 45 minutes, her work at 7-Eleven (Tr. 19), as well as the fact that she exercised three to four times per week at a gym (Tr. 21). As with the citation to Plaintiff's work activity, however, it is not apparent, nor did the ALJ did not explain how these activities are inconsistent with the limitations offered by Mr. Gargasz's opinion.

Although Mr. Gargasz is not a treating physician subject to the higher scrutiny of the treating physician rule, SSR 06-3p requires an explanation. Here, although the ALJ "explain[ed] the weight given to" the opinion, his reasons for doing so are not supported by substantial evidence, and his "discussion of the evidence in the . . . decision" does not "allow [the] claimant or subsequent reviewer to follow the [ALJ's] reasoning". SSR 06-3p, 2006 WL 2329939, at *6.

For these reasons – the lack of explanation of the "issues with medical compliance", "improve[ment]", and alleged inconsistency between Plaintiff's work activity or daily activities and Mr. Gargasz's opinion (Tr. 20) – the undersigned finds the ALJ's evaluation of Mr. Gargasz's

opinion not supported by substantial evidence. And Mr. Gargasz's opined restrictions conflict with the RFC. Therefore, this matter should be reversed and remanded for further evaluation.

Credibility / Subjective Statements

Plaintiff also challenges the ALJ's assessment of her subjectively-reported symptoms, specifically her testimony regarding her fluctuating blood sugars and resulting symptoms. This argument is intertwined with Plaintiff's challenge to the ALJ's consideration of Mr. Gargasz's opinion and the RFC as a whole. Because remand is required as described above, the undersigned also recommends the Court order the Commissioner to reconsider/re-explain his analysis of Plaintiff's subjective statements on remand.

The undersigned notes that the Commissioner's brief offers significant rationale in support of the ALJ's ultimate conclusions regarding both the opinion evidence/RFC and Plaintiff's credibility. For example, the Commissioner's brief summarizes numerous medical records in which Plaintiff failed to make certain complaints. *See, e.g.*, Doc. 14, at 4, 6-8, 12. But this is a *post-hoc* justification of the ALJ's decision. That is, the ALJ himself did not cite Plaintiff's lack of complaints in other records as a rationale to support his discounting of Mr. Gargasz's opinion or of the credibility of Plaintiff's subjective statements. This Court cannot accept such *post-hoc* rationale. *See Williams v. Comm'r of Soc. Sec.*, 227 F. App'x 463, 464 (6th Cir. 2007) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (a reviewing court, in assessing the decision of an administrative agency, must judge its propriety solely by the grounds invoked by the agency)). As the Seventh Circuit succinctly summarized:

> But regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ. *See SEC v. Chenery Corp.,* 318 U.S. 80, 93–95 . . . (1943); *Johnson v. Apfel,* 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996). That is why the ALJ (not the Commissioner's lawyers) must "build an

accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001).

*Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). The bridge between the evidence and the ALJ's conclusion is lacking in the instant case. Remand is therefore required.

Finally, the undersigned simply points out – as Plaintiff does in Reply (Doc. 15, at 5) – an unsupported statement made by the ALJ in his opinion so as to avoid such a repeated misstatement on remand. At the end of his decision, the ALJ stated that "while the claimant may require breaks to check her blood sugar level, the record shows that she has an insulin pump, which regulates her blood sugar level better than her previous regimen." (Tr. 21). However, neither the ALJ, nor the Commissioner in his brief, cite evidence for this statement. In fact, the Commissioner re-phrases so as to make the statement more accurate. *See* Doc. 14, at 18 ("Furthermore, the ALJ considered Plaintiff had recently started using her insulin pump, and while she was still struggling with getting adjusted to the new regimen, the expectation from Nurse Gargasz, Plaintiff's own diabetes expert, was that the pump would better regulate her blood sugar going forward.") (citing Tr. 21, 1969). While it is certainly true that Mr. Gargasz had that expectation, *see* Tr. 1969 ("I do believe insulin pump will help with variability"), the ALJ pointed to nothing in the record that it actually came to fruition. And, indeed, Plaintiff's testimony was to the contrary, as evidenced by the following exchange with the ALJ:

> A: I was diagnosed recently as uncontrolled diabetes and they had recently given me an insulin pump to help me control it.
>
> Q: You did get the pump?
>
> A: I did get an insulin pump - -
>
> Q: Okay.

A:      - - but it's nothing but a headache. I've been to the doctor four times. I've only had it two months and they can't figure out why it keeps jumping or my sugar keeps jumping.

Q:      Is there kind of like a period of time where you have to break it in, it has to get used to your body and you have to get use[d] to it?

A:      Yeah and they said that period should have already happened within the first two weeks - -

Q:      Okay.

A:      - - of calling a trainer and somebody that knows everything about the pump. Not just the people that make the pump, you can call them, but the trainer that actually helps me and says, I want you to do this and change your Basal rate. Well, I don't know how to do that. She would have to tell me how to do that. So we've been through all of the processes trying to level it out. Yesterday, my sugar wouldn't come down below 400. Today, I couldn't get it over 70. So it's always . . . a big thing.

*Id.* Although the ALJ is certainly permitted to evaluate the credibility of Plaintiff's subjective reports, his decision to do so must be based on substantial evidence. Here, the ALJ did not point to any evidence of record – much less substantial evidence – that the insulin pump "regulates [Plaintiff's] blood sugar level better than her previous regimen." (Tr. 21).

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB not supported by substantial evidence and recommends the decision be reversed and remanded for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).


 s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).